IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

JAMES CARUTH,

Plaintiff,

v.

WEXFORD HEALTH SOURCES,
INC., *et al.*,

Defendants.

Case No. 16-cv-6621

Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

In this case James Caruth challenges his medical treatment at a number of different Illinois prisons. Caruth filed this lawsuit pursuant to 42 U.S.C. § 1983, suing medical provider Wexford Health Sources, Inc. ("Wexford"), Dr. Kul Sood, Dr. Andrew Tilden, Dr. John Trost, Dr. Joseph Sangster, and Physician Assistants Riliwan Ojelade and Mary Schwarz. He alleges that Defendants were deliberately indifferent to his lower back pain, numbness, and a large lump in his left buttock. Caruth argues that the Defendants' deliberate indifference to his serious medical needs violated the Eighth Amendment. In addition, he brought a claim for medical malpractice under Illinois law. Wexford and the individual defendants[1] have moved for summary judgment. For the reasons stated below, the Court rules as follows on Defendants' summary judgment motions: Wexford's motion [251] is granted; Dr. Sangster's

---

[1] Defendants Lange, Obaisi, and Elazegui were previously dismissed from this suit. [132, 244, 250].

1

motion [255] is granted; Dr. Sood's motion [259] is granted; Dr. Tilden's[2] motion [263] is denied in large part; Dr. Trost's motion [267] is denied; PA Schwarz's motion [271] is granted; and PA Ojelade's motion [275] is denied.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id*. After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id*. at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable

---

[2] Defendant Dr. Andrew Tilden passed away in February 2023 during the pendency of this case. On plaintiff's unopposed motion, the Court substituted Pamela E. Hart, Administrator of Dr. Tilden's Estate, as a party-defendant in place of Tilden in this action. [335]. The Court permitted Tilden's Estate to file a reply brief and plaintiff to file a surreply. [337].

inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## BACKGROUND[3]

### A. The Parties

Caruth was an Illinois Department of Corrections (IDOC) inmate at various correctional centers from 1991 until 2021. PSOF ¶ 1; SSOF ¶ 1.[4] He was released from prison in January 2021. *Id.* Dr. Joe Sangster, a licensed physician in Illinois who specializes in psychiatry, is a Staff Psychiatrist at Pontiac and Stateville. SSOF ¶ 2. Dr. Sangster treated Caruth for his mental health disorders and saw him three times in 2017 (Caruth is not, however, making claims related to his mental health). *Id.* ¶¶ 5, 15. Dr. Sangster's treatment of patients at Pontiac and Stateville focused mainly on mental health issues; he never treated Caruth for a lipoma or degenerative disc disease. *Id.* ¶ 13.

---

[3] The facts are taken from the parties' Rule 56.1 statements and are undisputed unless otherwise noted.

[4] "PSOF" is Caruth's 56.1 statement of additional facts (Dkt. 309). "SSOF" is Sangster's 56.1 statement of facts (Dkt. 256); "KSOF" is Sood's 56.1 statement of facts (Dkt. 261); "TSOF" is Trost's 56.1 statement (Dkt. 269); "ASOF" is Andrew Tilden's statement (Dkt. 265); "WSOF" is Wexford's Rule 56.1 statement (Dkt. 253); "MSOF" is Schwarz's Rule 56.1 statement (Dkt. 273); "OSOF" is Ojelade's Rule 56.1 statement (Dkt. 277).

Dr. John Trost is a general surgeon and licensed physician in Illinois; he was the medical director at Menard from 2013 until 2017. TSOF ¶ 2.[5] Dr. Kul Sood is a licensed physician in Illinois who was stationed at the Northern Reception and Classification Center (NRC) since July 2016. KSOF ¶ 2. Between April 14, 2016 and November 28, 2016, Caruth was seen at NRC by Dr. Sood and PA Schwarz. *Id.* ¶ 8. Dr. Sood saw Caruth on two occasions: October 1 and 14, 2016. *Id.* ¶ 10. Dr. Sood never treated Caruth before he saw him on October 1, 2016. *Id.* Dr. Tilden was an internal medicine doctor and licensed physician in Illinois. ASOF ¶ 1. He was the medical director at Pontiac until about December 1, 2017, and returned as the medical director at Pontiac in October 2018. *Id.* ¶ 2.

Mary Schwarz ("PA Schwarz"), is a licensed physician's assistant in Illinois. MSOF ¶ 2. She treated Caruth in the Fall of 2016 at NRC, which is a separate facility from Stateville. *Id.* ¶ 5. Riliwan Ojelade ("PA Ojelade") is a physician's assistant who worked at Pontiac from April 2011 until October 2018. OSOF ¶ 2. Finally, Wexford Health Sources, Inc. is a corporation and the employer of the individual defendants at the relevant times in this case. WSOF ¶¶ 1, 5.

## B. Overview of Caruth's Health Conditions and Claims and the Expert Reports

Caruth has a history of lower back pain and numbness. PSOF ¶ 3. Caruth first complained about a bump on his left buttock in 2012 which was a benign lesion or tumor on his buttock. *Id.* ¶ 10. For any medical provider, the standard of care is the

---

[5] Caruth disputes his exact transfer date but was transferred from Pontiac to Menard on approximately October 9, 2013 and transferred several other times in and out of Menard in 2014, 2015 and 2016. *Id.* ¶¶ 4–8.

same for a prison doctor and non-prison doctor and does not change depending on the facility. *Id*. ¶ 31. In his Second Amended Complaint (SAC) [86], Caruth brings three counts pursuant to the Eighth Amendment for denial of medical treatment and deliberate indifference and one state-law count for medical malpractice.[6]

On summary judgment, the parties submitted several expert reports. Caruth submitted experts reports of orthopedic surgeon Dr. G. Claude Miller [257-5 ("Miller Rep.")] and dermatologist Dr. Vesna Petronic-Rosic [257-7 ("Petronic-Rosic Rep.")]. Defendants submitted expert reports of orthopedic spinal surgeon Dr. Baback Lami [278-14], internal medicine physician Dr. Mindy Schwartz [270-11], physician assistant Janet Furman [274-14] and psychiatrist Dr. John K. Hearn [257-9 ("Hearn Rep.")].

## C. Preliminary Evidentiary Matters

The Court addresses preliminary evidentiary matters raised by the parties on summary judgment. First, at several points Defendants challenge Caruth's "self-serving testimony" about harm from Defendants' action or inaction. But "self-serving" affidavits and testimony can be "a legitimate method of introducing facts on summary judgment." *McKinney v. Off. of Sheriff of Whitley Cnty.*, 866 F.3d 803, 814 (7th Cir. 2017) (cleaned up); *see also Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). This challenge is therefore not persuasive.

---

[6] The SAC references the Fourteenth Amendment however Caruth clarifies in his response brief that his claims "do not allege violations of Mr. Caruth's Fourteenth Amendment rights, but are rather brought for violations of his Eighth Amendment rights, incorporated through the Fourteenth Amendment to the individual states." [289 at 17].

Next, the parties challenge each other's Local Rule 56.1 statements. The Court finds neither side fully complied with Rule 56.1 and the numerous and sometimes unclear objections required this Court to parse many disputed or undisputed (and supported or unsupported) facts and responses. The Court will not strike facts outright but will address relevant facts as they are pertinent to the issues herein.

## ANALYSIS

### I.     The Eighth Amendment

The Eighth Amendment requires prison officials to provide healthcare to incarcerated inmates who cannot obtain healthcare on their own, *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021), and imposes liability on those who act with deliberate indifference to a substantial risk of serious harm to inmates, *Eagan v. Dempsey*, 987 F.3d 667, 693 (7th Cir. 2021). A plaintiff alleging deliberate indifference must show: (1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition. *See id*. at 694. In this case, Defendants do not dispute that Caruth's medical conditions were objectively serious, so only the second prong is in dispute.

The second prong, the subjective inquiry, requires a plaintiff to provide evidence that each defendant acted "with a 'sufficiently culpable state of mind.'" *Peterson v. Wexford Health Sources, Inc.*, 986 F.3d 746, 752 (7th Cir. 2021) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). "To establish deliberate indifference, a plaintiff must show that the defendant '*actually* knew of and disregarded a substantial risk of harm.'" *Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) (quoting *Petties v. Carter*,

6

836 F.3d 722, 728 (7th Cir. 2016) (en banc)). Courts "examine the totality of an inmate's medical care when considering whether that care evidences deliberate indifference to his serious medical needs." *Dunigan ex rel. Nyman v. Winnebago Cnty.*, 165 F.3d 587, 591 (7th Cir. 1999) (cleaned up).

## II.    Doctor Defendants

The Doctor Defendants contend that summary judgment is warranted in their favor. The Court agrees as to Drs. Sangster and Sood. However the Court does not agree as to Dr. Trost and Dr. Tilden (though the Court agrees with Dr. Tilden that the punitive damages claim should be dismissed).

### a.  Dr. Sangster

Caruth argues that psychiatrist Dr. Sangster deliberately disregarded his duty to contact medical colleagues about their failure to treat Caruth's lipoma, which Caruth says he raised during his psychiatric sessions. As to Count IV (state law medical malpractice), Dr. Sangster responds that Caruth did not provide expert testimony that any conduct by him caused Caruth's injuries. And as to the Eighth Amendment claims (Counts I and III), Dr. Sangster contends that Caruth has not provided any evidence that he was involved in any of Caruth's physical, medical treatment. The Court agrees with Dr. Sangster.

Beginning with the Eighth Amendment claims, to be held liable under § 1983, a defendant must be personally involved in the underlying constitutional deprivation. *Johnson v. Rimmer*, 936 F.3d 695, 710 (7th Cir. 2019); *Williams v. Shah*, 927 F.3d 476, 482 (7th Cir. 2019). This rule applies in prisoner medical care cases. *See Estate*

7

of *Perry v. Wenzel*, 872 F.3d 439, 459 (7th Cir. 2017). Caruth does not dispute this. Nevertheless he argues that psychiatrists must still "alert medical personnel about unresolved physical ailments" and "[expert] Dr. Petronic-Rosic testified that Dr. Sangster had a broader obligation as a member of Mr. Caruth's interdisciplinary healthcare team, regardless of his specialization." [289 at 33, 35].

Dr. Petronic-Rosic is an Attending Dermatologist and Dermatopathologist at Cook County John Stroger Hospital in Chicago. Petronic-Rosic Rep. at 2. Dr. Petronic-Rosic performed a medical evaluation of Caruth's buttock lesion on January 30, 2022. *Id.* at 3. Dr. Petronic-Rosic opined that defendants in this case did not meet the standard of care in treating Caruth's buttock lesion. *Id.* at 10–12. As to Dr. Sangster, Dr. Petronic-Rosic acknowledged that he knew "Caruth was referred with a painful lipoma, *but that is not in his area of expertise.*" *Id.* at 10. Dr. Petronic-Rosic nevertheless opined that it was Dr. Sangster's "responsibility to alert Mr. Caruth's primary care team of the pain he was having so it could be adequately addressed," and because he did not do so, he did not meet the standard of care. *Id.* at 11. However, Caruth does not explain how this establishes Dr. Sangster's personal involvement in the medical treatment of Caruth's lipoma. And Defendants' psychiatric expert opined that Dr. Sangster complied with the standard of care for psychiatrists in his treatment of Caruth and that Dr. Sangster did not do anything to cause or contribute to Caruth's mental or physical injury. (Hearn Rep. at 18).

Personal involvement for a § 1983 claim "is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent." *Mitchell*, 895

8

F.3d at 498. In *Mitchell* for example, the Seventh Circuit affirmed summary judgment in favor of a prison psychologist because she was not sufficiently involved in the alleged failure to provide particular treatment. *Id*. at 499. The Court acknowledged that the psychologist could be liable if "she acquiesced in the failure to provide necessary medical treatment." *Id*. at 498. But there was no evidence the psychologist "could have sped up [the doctor's] evaluation or the Committee's deliberations [about hormone therapy], or could have influenced the Committee's final decision," and there was evidence that the psychologist had no authority to order hormone therapy. *Id*. at 498–99. Similarly here, Dr. Petronic-Rosic's observation that Dr. Sangster was aware of the lipoma and that he should have "alert[ed] Mr. Caruth's primary care team of the pain" is not evidence that Dr. Sangster was involved in the evaluation or treatment of Caruth's lipoma. Caruth concedes that Dr. Sangster saw him only three times, for mental health issues, and never treated Caruth's lipoma. SSOF ¶¶ 5, 13. Caruth further concedes that treating a non-mental health condition would be outside the scope of Dr. Sangster's employment and Dr. Sangster would not be competent to treat a non-mental health condition of a patient. (Dkt. 281 at ¶ 14).

Caruth relies on *Thomas v. Martija,* 991 F.3d 763 (7th Cir. 2021), however that case did not involve a psychologist or psychiatrist. The Seventh Circuit in *Thomas* addressed a claim of delay in referring an inmate to a specialist in the face of a known need for specialist treatment. Caruth's claim against Dr. Sangster is not one for delay in referring him to a specialist, and Caruth does not argue that Dr. Sangster was authorized to make such a referral.

Next, as to the medical malpractice claim against Dr. Sangster, the Court agrees that Caruth did not provide expert testimony that any of Dr. Sangster's conduct caused Caruth's injuries. "In a medical malpractice action, the plaintiff must prove the following elements: (1) the proper standard of care against which the defendant physician's conduct is measured; (2) an unskilled or negligent failure to comply with that standard; and (3) a resulting injury proximately caused by the physician's want of skill or care." *Perkey v. Portes-Jarol*, 1 N.E.3d 5, 13 (Ill. App. 2013). Generally a plaintiff "must prove these elements by presenting expert medical testimony." *Stanphill v. Ortberg*, 91 N.E.3d 928, 937 (Ill. App. 2017).

Caruth does not dispute that Illinois requires expert testimony on causation. *See Simmons v. Garces*, 763 N.E.2d 720, 731 (Ill. 2002) ("In a medical malpractice case, proximate cause must be established by expert testimony to a reasonable degree of medical certainty."). Caruth argues that "Dr. Petronic-Rosic and Dr Miller have opined on the link between each Individual Defendants' deviation from the standard of care and Mr. Caruth's pain." [289 at 54]. Yet Caruth does not specifically address Dr. Sangster. Indeed Dr. Petronic's report did not discuss how Dr. Sangster's conduct caused Caruth's injuries, and Dr. Miller did not opine on Dr. Sangster's conduct at all. *See* Petronic-Rosic Expert Rep.; Miller Rep. And as discussed, Dr. Hearn opined that Dr. Sangster did not cause any of Caruth's injuries.

For these reasons, there is no genuine issue of fact as to Dr. Sangster's liability in this case and summary judgment is granted in Dr. Sangster's favor.

### b. Dr. Trost

Caruth argues that a reasonable jury could find Dr. Trost was deliberately indifferent by persisting with an ineffective course of treatment for Caruth's chronic back pain, numbness, and lipoma, during Caruth's time at Menard from 2015 to 2016. "[A]n inmate can establish deliberate indifference by showing that medical personnel persisted with a course of treatment they knew to be ineffective." *Goodloe v. Sood*, 947 F.3d 1026, 1031 (7th Cir. 2020). Dr. Trost does not dispute that he was aware of Caruth's low back pain and lipoma. Still, Dr. Trost argues that: (1) Caruth fails to provide material facts to show that Dr. Trost was deliberately indifferent to his serious medical needs, and (2) Caruth's medical malpractice claim against him fails.

Dr. Trost is a general surgeon and licensed physician, and was the medical director at Menard from November 2013 until March 2017. TSOF ¶ 2. According to Dr. Trost he first saw Caruth on March 20, 2015 at Menard. *Id*. ¶ 9 (Caruth claims he also saw Dr. Trost in 2014). At visits with Caruth in September 2015, Dr. Trost documented Caruth's complaints of generalized numbness, tingling, and paresthesia. TSOF ¶¶ 62, 64. On November 24, 2015, Dr. Trost reviewed a November 13, 2015 x-ray report and interpreted the findings to mean that Caruth had degenerative disc disease at the L3-4 and L5-S1 levels; and that it had progressed since his prior study on May 4, 2010. *Id*. ¶ 20. Dr. Trost continued Caruth's prescription for Neurontin which is a neuropathic pain medication that cuts down on the firing rate of the nerves and helps pain nerve distribution. *Id*. ¶ 59. Dr. Trost did not prescribe any additional pain medication. *Id*. ¶¶ 59–60.

Caruth argues that Dr. Trost did nothing about his back pain at the March 2015 visit and did not order an MRI until a year later in March 2016. Caruth contends that during his numerous visits with Dr. Trost between 2014 and 2016, Caruth complained about his severe lower back pain, numbness, and his painful lump. [289 at 24]. Failure to properly treat pain can support a deliberate indifference claim. *Grieveson v. Anderson*, 538 F.3d 763, 779 (7th Cir. 2008). Although Dr. Trost claims that Caruth did not complain of low back pain until March 2016 [268], Dr. Trost does not provide a reason for the Court to disbelieve Caruth's testimony that he complained earlier and numerous times. It is well-settled that a court does not make credibility determinations on summary judgment. *See Viamedia*, 951 F.3d at 467; *see also White v. Woods*, 48 F.4th 853, 862 (7th Cir. 2022) (the court views the record in the light most favorable to prisoner on summary judgment).

Dr. Trost's other contention is that Caruth has not provided "verifying medical evidence" to support his claim. As an initial matter, supplying verifying medical evidence is needed for a claim of *delay* in treatment. *See Grieveson*, 538 F.3d at 779. Here, Caruth claims Dr. Trost persisted with an ineffective course of treatment. Even so, Caruth provided expert testimony that Dr. Trost "failed to properly assess and address Mr. Caruth's back pain [by] failing to immediately request an MRI and EMG, and failed to prescribe appropriate medication given Mr. Caruth's severe pain and progression to paresthesias." (Miller Rep. at 10). Dr. Miller opined that "to a reasonable degree of orthopedic surgical certainty, Dr. Trost, deviated from the standard of care by not providing appropriate care for Mr. Caruth's spinal problems."

12

*Id*. at 11. In Dr. Miller's opinion, "no community physician would ignore years of severe low back pain with clear-cut radiologic progression and persistent 8-10/10 pain without far more aggressive treatment." *Id*. Defendants offer competing opinions of Drs. Lami and Schwartz about Dr. Trost's care, but these experts' testimonies underscore that there are disputed issues of fact. *See Morris v. Obaisi*, No. 17-CV-05939, 2023 WL 2745508, at *6 (N.D. Ill. Mar. 31, 2023) (explaining that "conflict between competing expert opinions presents a classic jury issue that precludes determination at the summary judgment").[7]

Dr. Trost puts forth a number of critiques of Dr. Miller's opinions. These include that: Dr. Miller discussed whether Dr. Trost was negligent, as opposed to deliberately indifferent, Dr. Miller merely disagreed with Dr. Trost's medical judgment, and Dr. Trost eventually did provide some medication to Caruth. [268]. Dr. Trost also relies on Dr. Khalid Malik's[8] statements, after reviewing the 2019 MRI that Caruth was not a surgical candidate and would benefit from conservative treatment. *Id*. But the question is about Dr. Trost's treatment in 2015 and 2016. And Caruth has provided Dr. Miller's expert testimony that Dr. Trost did not meet the standard of care and was deliberately indifferent to Caruth's back condition at the time he treated Caruth. Dr. Trost's challenges to Dr. Miller's opinions can be raised on cross-examination at trial as they go to weight of the testimony, not its admissibility. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 809 (7th Cir. 2013); *see also Viamedia*, 951 F.3d at

---

[7] Defendants' own expert Dr. Schwartz testified that Mr. Caruth "has longstanding back pain . . . that goes back for many, many, many years." PSOF ¶ 39.

[8] Dr. Malik is a board-certified anesthesiologist who treated Caruth in 2019. TSOF ¶ 71.

467 (the court must refrain from assessing credibility or weighing evidence on summary judgment). Finally, the fact that a patient receives "some treatment" does not bar a deliberate indifference claim. *Greeno v. Daley*, 414 F.3d 645, 654 (7th Cir. 2005).

As for the lipoma, Caruth argues that when Dr. Trost saw him on March 20, 2015, Dr. Trost noted the painful lipoma and completed a collegial review form to have Caruth sent to a general surgeon for further evaluation and excision. Dr. Trost admits he completed the Special Services Referral Report to have Caruth evaluated for the six-centimeter painful mass on his left buttock and to consider possible excision by a general surgeon. [309 at 19]. During collegial review, however, the referral for surgery evaluation of Caruth's lipoma was not approved. *Id*. at 20. Dr. Trost does not dispute that as medical director he had the ability to appeal a collegial review decision. *Id*. Dr. Trost says that after the denial, Caruth was not complaining of pain from the lipoma; Caruth counters that he complained for years about the lipoma, including in numerous grievances and sick call requests. *Id*. at 12, 21. These differing accounts of Caruth's complaints and Dr. Tilden's admission that he could appeal the decision about Caruth's lipoma create factual disputes about Dr. Trost's treatment and follow-up for Caruth's lipoma. In addition, Dr. Petronic-Rosic opined that Dr. Trost could have excised the lesion on-site himself. TSOF ¶ 34. Dr. Trost says that was not possible. *Id*. Again, a jury will need to weigh this competing evidence and witness credibility. *See e.g. Berry v. Peterman*, 604 F.3d 435, 441-42 (7th Cir. 2010) (reversing a grant of summary judgment to prison doctor who took the "easier" path

14

of prescribing ineffective pain medication rather than the "obvious alternative" of referring the plaintiff out after his repeated reports of pain).

As to the state law claim, Dr. Trost contends that neither Dr. Miller nor Dr. Rosic opined that any action or inaction of Dr. Trost was the proximate cause of any of Caruth's alleged injuries. To the contrary, these experts' opinions support a reasonable inference that Dr. Trost was deliberately indifferent to Caruth's back and lipoma conditions. Dr. Miller specifically opined that Dr. Trost did not address Caruth's back pain, and as a result Caruth suffered "persistent pain because of [inadequate back care]." (Miller Rep. at 10; Miller Dep. (Dkt. 257-4) at 94). Dr. Rosic opined that Dr. Trost should have resubmitted for review the request for lipoma surgery evaluation or performed the excision himself in house. Dr. Petronic-Rosic Rep. at 11. She concluded that Dr. Trost's conduct was "not the standard of care for management of a painful lesion that interferes with daily activity such as the case with Mr. Caruth." *Id*.

The evidence from the experts, the medical records, Dr. Trost's own admissions, and Caruth's testimony, taken together, give rise to a jury question about whether Dr. Trost was deliberately indifferent and whether he is liable for medical malpractice with regard to Caruth's back pain and lipoma. Construing the record in the light most favorable to Caruth, a reasonable jury could find in favor of Caruth on his claims against Dr. Trost. Therefore, summary judgment is denied as to Dr. Trost.

### c. Dr. Sood

Caruth next asserts that a reasonable jury could find that Dr. Sood was deliberately indifferent by persisting with an ineffective course of treatment for Caruth's chronic back pain, numbness, and lipoma, during Caruth's time at NRC in 2016. Dr. Sood contends that he only saw Caruth twice, and provided care to Caruth consistent with the relevant standard of care and did not cause harm to Caruth. Dr. Sood asserts that: (1) the state law medical malpractice claim must be dismissed for failure to provide expert testimony as to proximate cause; (2) Dr. Sood was not deliberately indifferent; (3) Caruth is not entitled to demand specific care and Dr. Sood provided proper care; (4) Dr. Sood was not personally involved in any of Caruth's care after he transferred from the NRC.

It is undisputed that Dr. Sood saw Caruth only two times, two weeks apart. KSOF ¶ 10. At the October 1, 2016 visit with Dr. Sood, Caruth complained of chronic low back pain and a burning sensation in his hands and feet; reported pain in his lumbosacral area and self-reported DJD (degenerative joint disease). *Id*. ¶ 11. Dr. Sood assessed Caruth with chronic low back pain, prescribed Naprosyn 500mg, Tegretol 200mg, and advised Caruth to do back stretch exercises. *Id*. On October 14, Caruth reported back pain, hand and knee pain with numbness; he also self-reported a having a seizure the night before. *Id*. ¶ 14. Dr. Sood assessed Caruth as having chronic low back pain and planned to check with the pharmacy about his prescriptions for Naprosyn and Tegretol. *Id*. At the October 1st appointment, Caruth told Dr. Sood that in April, he had undergone an MRI. PSAF ¶¶ 19, 29. Dr. Sood did

not have the MRI results. *Id.*[9] Although Dr. Miller opined that Dr. Sood failed to properly evaluate Caruth's paresthesias or address Caruth's back pain, Dr. Miller did not explain what Dr. Sood should have done differently. (Miller Rep. at 9). It is undisputed that an MRI had already been done before Caruth saw Dr. Sood, and that Dr. Sood prescribed Naprosyn, Tegretol, and recommended back stretch exercises. SSOF ¶ 52. Caruth also concedes that Naprosyn helped his pain. *Id.* ¶ 11.

Caruth maintains that Dr. Sood's treatment should have been more aggressive. But "disagreement with a doctor's chosen course of treatment does not make the treatment objectively unreasonable." *Vogelsberg v. Kim*, No. 20-2926, 2022 WL 1154767, at *3 (7th Cir. Apr. 19, 2022). In addition, Caruth asserts that Dr. Sood was indifferent when Caruth reported having a seizure at his October 14th appointment, and Caruth believes the seizure was a side effect of Tegretol that Dr. Sood prescribed. [289]. At that appointment, Dr. Sood noted there was no documentation of a seizure and assessed Caruth as "neurovascularly intact". SSOF ¶ 14. Still, Caruth believes Dr. Sood should have adjusted Caruth's prescriptions or treatment plan. Perhaps Dr. Sood should have looked further into the impact of Tegretol, but he did assess Caruth at the appointment. And Caruth does not argue that he suffered any more seizures following that appointment or anytime thereafter. Even if the evidence at most shows negligence by Dr. Sood, that does not satisfy the deliberate indifference standard. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012).

[9] Dr. Miller explained that for the April 2016 MRI, the radiologist notes state that the MRI shows grade 1 spondylolisthesis of L3 on L4 with bilateral pars defects and severe disk space narrowing; significant Modic changes at L3 to S1, but no pars defects at the lower levels; and mild disk bulges at all levels. (Miller Rep. at 5).

In addition, the Court agrees with Dr. Sood that the *Goodloe,* 947 F.3d 1026 case is distinguishable. There, Dr. Sood saw the plaintiff numerous times, began a course of treatment Dr. Sood acknowledged resulted in "no improvement" to the plaintiff, and Dr. Sood concluded that plaintiff needed to see any outside specialist but took no steps to ensure that happened. *Id.* at 1031. Those are not the facts here.

As for the lipoma, Caruth spends significant time discussing whether Dr. Sood knew of and documented the lipoma, but it is not clear what he believes Dr. Sood should have done differently. Dr. Petronic-Rosic opined that Dr. Sood should have been aware of the lipoma and should have addressed "all the problems that [Caruth] requested sick call for." (Petronic-Rosic at 10). This does not give rise to an inference that Dr. Sood was deliberately indifferent because that requires that Dr. Sood "'actually knew of and disregarded a substantial risk of harm'" *Mitchell*, 895 F.3d at 498, and "acted with a sufficiently culpable state of mind." *Peterson*, 986 F.3d at 752.

In sum, the evidence shows Dr. Sood's treatment decisions, based on only two visits with Caruth, were based on his "professional judgment [and] what the defendant believed to be the best course of treatment." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (cleaned up). Caruth's evidence about Dr. Sood does not cross the line beyond "mere negligence or even gross negligence." *Munson v. Newbold*, 46 F.4th 678, 681 (7th Cir. 2022).

As to the medical malpractice claim, Dr. Sood argues that Caruth failed to provide expert testimony on the element of proximate cause. Defendants' experts Dr. Mindy Schwartz and Dr. Lami similarly opined that Dr. Sood did not contribute to or cause

18

any of Caruth's injuries. (Schwartz Rep.; Lami Rep.). Caruth's experts, Dr. Miller and Dr. Rosic, opined that Dr. Sood "failed to properly evaluate Mr. Caruth's paresthesias or otherwise address Mr. Caruth's back pain" and it "was Dr. Sood's responsibility as physician and medical director to examine Mr. Caruth and address all the problems that he requested sick call for." (Miller Rep.; Rosic Rep.). But Caruth's experts' general statements provide no specifics about Dr. Sood's alleged deficient treatment or the injury Caruth suffered as a result. "Proximate cause" requires both cause in fact and legal cause, *Young v. Bryco Arms*, 821 N.E.2d 1078, 1085 (Ill. 2004), and the former "exists only if the defendant's conduct was a 'material element and a substantial factor in bringing about the injury.'" *TIG Ins. Co. v. Giffin Winning Cohen & Bodewes*, P.C., 444 F.3d 587, 591 (7th Cir. 2006). Caruth's expert reports do not satisfy that standard as to Dr. Sood.

The Court finds there is no genuine issue of material fact about whether Dr. Sood was liable for medical malpractice or deliberately indifferent to Caruth's back pain or lipoma.

### d. Dr. Tilden

Caruth argues that a reasonable jury could find Dr. Tilden was deliberately indifferent by persisting with an ineffective course of care in treating Caruth's lipoma and ignoring complaints of pain during Caruth's time at Pontiac. *See Smego v. Mitchell*, 723 F.3d 752, 756–57 (7th Cir. 2013). Against Dr. Tilden, it is not disputed that Caruth pursues allegations relating only to his lipoma, and only after 2013. [*see* 289, n. 10]. The parties dispute what the first date was that Caruth saw Dr. Tilden.

[282 ¶ 17]. Tilden says it was March 2017; Caruth says it was in 2012 or 2013. *Id*. It is undisputed Tilden was the medical director at Pontiac in 2012 and in 2017 when Caruth was at Pontiac. *Id*. ¶¶ 2, 5–9.

Though Dr. Tilden concedes that he treated Caruth, he says it was only for back pain, not Caruth's lipoma, and he says Caruth did not complain about the lipoma. Dkt. 344 ¶ 26; TSOF ¶¶ 72, 74. Caruth responds that the medical records reflected that he had a painful lipoma on his buttocks, and Dr. Tilden should have reviewed these records. [282]. Indeed Pontiac medical records from 2012, 2013, and 2014 note Caruth complaining about a boil on his left butt cheek that had been there about three years and was painful when sitting on it for about an hour, and noting Caruth's complaints of pain including that it was "very painful." [266-4 at 2–3, 6, 8]. Grievances and sick call slips from 2014 through 2017 show Caruth complaining about his painful lipoma. *See* PSOF ¶ 12.[10] In addition, Caruth testified that Dr. Tilden examined his lipoma and Caruth told Dr. Tilden it was painful on at least one occasion, and told Dr. Tilden he wanted it removed. (Caruth Dep. [266-1] at 30–31). For his part, Dr. Tilden maintains he has no recollection of Caruth's lipoma.

---

[10] Dr. Tilden suggests that Caruth's grievances and sick call slips should be ignored because they lack proof of delivery and the grievances are inadmissible evidence. [344 ¶ 12]. The Court does not agree, and does not see Caruth relying on the grievances for the truth of the statements in them. *See Taylor v. Wexford Health Sources, Inc.*, No. 16-CV-3464, 2022 WL 4329025, at *17 (N.D. Ill. Sept. 19, 2022) (plaintiff "offered evidence (including numerous grievances, letters, and his own testimony) from which a reasonable jury could find that [defendants] knew about Plaintiff's serious medical conditions and took no action."); *Flournoy v. Est. of Obaisi*, No. 17 CV 7994, 2020 WL 5593284, at *6 (N.D. Ill. Sept. 18, 2020) (finding grievance admissible as a record kept in the ordinary course of a business or organization).

20

Dr. Tilden tries to highlight the conflict between his testimony and Caruth's, as well as inconsistencies in Caruth's own testimony about who told Caruth his lipoma was a "fatty tumor." [343 at 10–11]. First, the Court will not disregard Caruth's testimony. *See Thomas*, 991 F.3d at 769 (explaining that plaintiff's "first-hand account of that conversation [with the doctor] is competent evidence."). And even if the Court agreed that Caruth's deposition testimonies are internally inconsistent, and that Dr. Tilden's and Caruth's testimonies conflict, those are not issues to be resolved by this Court on summary judgment. *Runkel v. City of Springfield*, 51 F.4th 736, 742 (7th Cir. 2022) ("We do not weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true.") (cleaned up).

Viewing the evidence in the light most favorable to Caruth (*White*, 48 F.4th at 862), the Court finds that a reasonable jury could conclude that Caruth suffered unnecessarily or that the delay caused a worse outcome for his lipoma. However, the Court agrees with Dr. Tilden that the punitive damages claim must be dismissed since Dr. Tilden is deceased. *See Taylor*, 2022 WL 4329025, at *14; *Zavala v. Obaisi*, No. 17-CV-03042, 2021 WL 1172774, at *13 (N.D. Ill. Mar. 29, 2021).

Turning to the medical malpractice claim, Caruth's expert, Dr. Petronic-Rosic explained that in addition to being the Pontiac medical director, Dr. Tilden saw Caruth on multiple occasions. [Petronic-Rosic Rep. at 10]. She opined that "Dr. Tilden as the medical director is responsible for failure to address the medical needs of Mr. Caruth while at Pontiac", he is "responsible for Mr. Caruth not having proper

diagnosis and management of the left buttock lesion while being housed there" and the "standard of care was not met because Mr. Caruth did not get the correct diagnosis and management for his painful buttock lesion." *Id*. This evidence of proximate cause is sufficient to survive summary judgment for the medical malpractice claim against Dr. Tilden. *See Miranda v. Cnty. of Lake,* 900 F.3d 335, 348 (7th Cir. 2018). The Court does not agree with Dr. Tilden's narrow view of the timeframe Dr. Rosic opined about [343 at 12], and in any event that is more appropriately explored in cross-examination at trial of Dr. Rosic. Dr. Tilden also points to the reports of Drs. Lami and Schwartz opining that Dr. Tilden did not cause or contribute to Caruth's pain. But again, the weighing of this evidence and expert testimonies is for the jury. *See Morris*, 2023 WL 2745508, at \*6; *see also Anderson*, 477 U.S. at 255.

Thus the Court dismisses Caruth's punitive damages claim against Dr. Tilden but otherwise denies summary judgment as to Dr. Tilden.

### III.    PA Defendants

The PA Defendants Ojelade and Schwarz argue that Caruth's claims against them cannot survive summary judgment. They argue that (1) Caruth's state law medical malpractice must be dismissed because Caruth's retained experts cannot legally opine on the standard of care for a physician's assistant and their reports do not address proximate cause; (2) the pre-October 2013 claims as to PA Ojelade are time barred; (3) they were not deliberately indifferent to Caruth's alleged serious medical needs and Caruth does not satisfy the subjective element of his deliberate indifference

claims; and (4) PA Ojelade was not personally involved in any of Caruth's care when he was not at Pontiac. The Court finds that summary judgment is warranted in favor of PA Schwarz, but there are questions of fact regarding PA Ojelade.

### a. PA Schwarz

Against PA Schwarz, Caruth's Eighth Amendment claims are about his back pain, numbness and lipoma. PA Schwarz states that she only treated Caruth one time, on November 21, 2016, at NRC; Caruth says it was once or "maybe two times." [284]. Caruth does not dispute that Schwarz saw Caruth in November 2016 on a "writ return", meaning he had been referred to an outside cardiology specialist based on a heart condition. [284 at 5]. Caruth also does not dispute that there was "nothing in PA Schwarz's note from November 21, 2016 that would have required a consultation with an orthopaedic or neurological surgeon, or required a consultation for an MRI." *Id*. at 6. Her note also stated that Caruth "did not have decreased motor weakness or sensation, and …found no atrophy." *Id*. Nevertheless Caruth argues that Schwarz made the "decision to not address the back pain by immediately requesting an MRI." [289]. Although expert Dr. Miller opined, as to Schwarz, that an "MRI should have been ordered years earlier." (Miller Rep.), there is no evidence Schwarz saw Caruth "years earlier." *See Cesal v. Moats*, 851 F.3d 714, 721 (7th Cir. 2017) ("[a] failure to act in the face of an obvious risk of which the official *should* have known is insufficient to make out a claim.").

As to his lipoma, Dr. Rosic made the general statement that it was "Ms. Schwarz's responsibility to examine Mr. Caruth and address all the problems that he requested

sick call for." [Rosic Rep.]. But her report does not state that PA Schwarz saw Caruth on a certain date, that Caruth ever complained of a lipoma to her, or that PA Schwarz failed to examine it. *Id*. *See Degrado*, 2021 WL 3737712, at *6 (granting summary judgment for defendant where evidence of defendant's subjective knowledge of plaintiff's serious medical condition was lacking). Even if Schwarz was aware of the lipoma, Caruth does not explain what she should have done differently at the single visit with Caruth which was a follow-up about his heart condition. The evidence reflects that PA Schwarz provided care to Caruth and exercised her medical judgment. *See Petties*, 836 F.3d at 729 ("[E]vidence that *some* medical professionals would have chosen a different course of treatment is insufficient to make out a constitutional claim.").

Therefore summary judgment is granted in PA Schwarz's favor on Caruth's Eighth Amendment claim.

### b. PA Ojelade

Caruth brings his Eighth Amendment claim against PA Ojelade for disregarding the substantial risks of harm associated with Caruth's lipoma. Caruth contends that Ojelade never removed the lipoma himself or ensured Caruth was referred to a specialist who would do so, prolonging Caruth's suffering. Caruth clarifies that his claim against PA Ojelade is focused on deliberate indifference in ensuring the lipoma's removal after October 2013 [289, n. 13].

PA Ojelade was a physician's assistant at Pontiac from April 2011 until October 2018. OSOF ¶ 2. From 2011 to 2018, the person he typically reported to was Dr.

Tilden. (Ojelade Dep. [278-2] at 56). PA Ojelade argues he provided appropriate care by initially directing Caruth to see medical director, Dr. Tilden, to evaluate his lipoma, and during later visits he focused on Caruth's request to change his neuropathic medication. [276]. On March 14, 2017, at his annual physical exam, as Caruth concedes, he refused his anus/rectum exam. [285 ¶ 15]. Caruth argues, however, that there is "no evidence that an anal exam is useful in or necessary for the assessment of a lipoma." *Id*. PA Ojelade does not dispute this, but argues he was prevented from observing Caruth's buttock and the lipoma. [298 at 12]. PA Ojelade contends "there is no evidence that [he] was consciously aware of Plaintiff's lipoma in 2017" [298 at 12].

But medical records reflect Caruth requesting medical assistance for his lipoma. In October 2012, for example, a nurse progress note stated that Caruth "request[ed] sick call for what appears to be a boil on left butt cheek." [291-1 at 51]. A few days later, the progress note stated that Caruth presented with a "buttock boil", that Caruth reported it was painful "when sitting on it for about an hour," and he "want[ed] it removed." *Id*. at 52. And Caruth testified that he told Ojelade that the lipoma was painful and he wanted it removed, and instead of responding that that, Ojelade started an argument with him. (Caruth Dep. at 30-31). In addition, Defendants' expert Lami testified that since 2012 although Caruth had not mentioned it in "all the visits," he did "complain of a bump in his buttock and [] requested it be removed." (Lami Dep. [274-7], p. 55). PA Ojelade acknowledged this information about the lipoma being painful when Caruth sits for an hour was relayed

to him. (Ojelade Dep. at 204). And Ojelade responded to this complaint by prescribing pain medicine. *Id.* at 205.

Ojelade insists that the "medical science says Plaintiff lipoma…not painful unless it is pushing on a nerve," but that does not override the evidence showing Caruth was complaining about his lipoma, complained of pain on at least some occasions, and specifically requested that it be removed. *See Goodloe*, 947 F.3d at 1027 ("Patients are often the best source of information about their medical condition."). The evidence as to Olejade thus "raise[s] enough questions to warrant a jury trial." *Id.* at 1028.

Thus the Court finds that Caruth's deliberate indifference claim against PA Ojelade survives summary judgment.

### c. Medical Malpractice Claim

As to the medical malpractice claims against the PA Defendants, as an initial matter, the Court does not find that it should disregard Caruth's expert's opinions. *See Williams v. Mary Diane Schwarz, P.A.*, No. 15 C 1691, 2018 WL 2463391, at *7 (N.D. Ill. June 1, 2018) (finding there was "no suggestion that physician assistants are held to a different standard of care than medical doctors with regard to the treatment at issue here"); *see also Vargas v. United States*, No. 1:16-CV-11012, 2020 WL 6894666, at *3 (N.D. Ill. Nov. 24, 2020).

As to PA Schwarz, the Court finds Caruth has not met the standard to show proximate cause. Caruth contends that "Dr. Miller opined that…PA Schwarz failed to provide adequate back care for years." (Dr. Miller Rep.). This is unsupported by the record which shows PA Schwarz saw Caruth a single time (and even accepting

Caruth's version, it was "maybe two times"). And Dr. Petronic-Rosic's opinion as to Schwarz is cursory explaining she didn't meet standard of care by not "address all the problems that he requested sick call for." (Dr. Petronic-Rosic Rep. at 10).

By contrast, Dr. Petronic-Rosic gave a more fulsome opinion about PA Ojelade:

> [he] treated Mr. Caruth 4-7 times; he never made a treatment plan for lipoma, but instead referred him to Dr. Tilden. He had never referred anyone out for surgery and he only prescribed them pain medication or requested Dr. Tilden see them. This fell short of the standard of care as a PA practicing independently (without direct supervision). A painful lipoma should have been surgically removed. It was his responsibility to provide the standard of care for Mr. Caruth, namely, either to excise the painful lesion, or to ensure that he is referred to a specialist capable of doing so. As he did neither, he did not meet the standard of care.

*Id*. This evidence of proximate cause supports Caruth's claim against PA Ojelade. *See Miranda*, 900 F.3d at 348.

Accordingly, Caruth has not shown there is an issue of material fact warranting a trial on his medical malpractice claim against PA Schwarz. But his medical malpractice claim against PA Ojelade survives.

## IV. Wexford

Caruth seeks to hold Wexford liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Wexford is "a private corporation that has contracted to provide essential government services – in this case, health care for prisoners." *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014). A corporate entity violates an inmate's constitutional rights "if it maintains a policy that sanctions the maintenance of prison conditions that infringe upon the constitutional rights of the prisoners." *Estate of Nova ex rel. v. Cnty. of Wood*, 226 F.3d 525, 530 (7th Cir. 2000). Causation is

27

important because an entity only faces liability under § 1983 if "execution" of that entity's "policy or custom inflicts the injury." *Grieveson*, 538 F.3d at 773; *see also Munson*, 46 F.4th at 682; *Stockton v. Milwaukee Cnty.*, 44 F.4th 605, 617 (7th Cir. 2022) ("For *Monell* liability to attach, [plaintiff] must first trace the deprivation of a federal right to some municipal action").

Caruth asserts that he has presented evidence raising issues of fact about whether Wexford had widespread policies (1) to delay or deny medical care to prisoners, (2) failing to provide continuous care to prisoners through lack of adequate review of medical records and prisoner complaints, (3) to deny specialty treatment and testing, and (4) prioritizing cost-cutting over inmate care. [289 at 53]. Wexford responds that there is no factual dispute showing that Caruth was injured as a result of any Wexford policy or procedure. Wexford also asks the Court to decline Caruth's request to apply the doctrine of *respondeat superior*.[11]

As an initial matter, the Court addresses Wexford's argument that Caruth is raising new theories, as his Second Amended Complaint does not allege that Wexford had custom or practice of not providing continuous care to inmates or that Wexford had a policy of elevating cost-cutting policies over providing adequate medical care. [328]. The Court agrees that these claims are not in the operative complaint. The Federal Rules of Civil Procedure do not require a plaintiff to plead legal theories, *see*

---

[11] Caruth argues that it is unnecessary for him to rely on respondeat superior liability but the Court should consider the "policy concerns from insulating private corporations from respondeat superior liability under Section 1983." [289]. *Iskander v. Village of Forrest Park,* remains undisturbed, however, *see Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 521 (7th Cir. 2019). This Court shares those concerns but is bound by precedent. So this Court declines to deny summary judgment on a theory of vicarious liability.

28

*Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996), but a plaintiff still must "raise factual allegations in their complaints." *Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859 (7th Cir. 2017). As a result "[a]n attempt to alter the factual basis of a claim at summary judgment may amount to an attempt to amend the complaint." *Id.* (internal citation omitted). The Court finds that prioritizing cost-cutting over inmate care is a new factual theory. The claim of not providing continuous care, by contrast, is not significantly factually different from delaying or denying medical care to prisoners.

This leaves Caruth's theories of delaying or denying medical care to prisoners, denying specialty treatment and testing, and failing to provide continuous care. Caruth argues that Wexford must be held liable for denying and delaying his constitutionally required medical care for his lower back pain and lipoma. [289]. Given the Court's rulings as to the individual defendant Wexford employees, the alleged constitutional violations remaining are the claims against Dr. Trost, Dr. Tilden and PA Ojelade for providing medical care that fell below Eighth Amendment standards.

Wexford contends that Caruth fails to provide evidence from other prisoners to support his *Monell* claim. Indeed a plaintiff "must point to other inmates injured by th[e] practice" and "allegations of an unconstitutional municipal practice or custom ... normally require evidence that the identified practice or custom caused multiple injuries." *Stockton*, 44 F.4th at 617 (cleaned up). Caruth's evidence is focused on his own experience which undoubtedly spans a long period of time. But beyond that, he

29

has not put forth evidence showing "a *widespread* practice that permeates a critical mass of an institutional body." *Brown v. City of Chicago*, 2022 WL 4602714, at *36 (N.D. Ill. 2022).

Therefore the Court finds that Caruth has not come forward with evidence to create a genuine issue of material fact that Wexford was liable for the underlying constitutional deprivation at issue in this case.[12]

## CONCLUSION

For the stated reasons, the Court ruled as follows on Defendants' summary judgment motions: Wexford's motion [251] is granted; Dr. Sangster's motion [255] is granted; Dr. Sood's motion [259] is granted; Dr. Tilden's motion [263] is denied in large part; Dr. Trost's motion [267] is denied; PA Schwarz's motion [271] is granted; and PA Ojelade's motion [275] is denied. Judgment is granted in favor of Defendants Dr. Sangster, Dr. Sood, Schwarz and Wexford. In person status hearing is set for October 24, 2023 at 10:00 AM to set a trial date.

E N T E R:

Dated: September 20, 2023

_____

MARY M. ROWLAND
United States District Judge

---

[12] The Court in its discretion denies the parties' request for oral argument.

30